Charles ASH, et al., Plaintiffs-Appellants,

v.

BOARD OF EDUCATION OF the WOOD-HAVEN SCHOOL DISTRICT, et al., Defendants-Appellees.

No. 81–1597.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1982.

Decided Feb. 7, 1983.

Daniel J. Hoekenga, Hiller, Larky & Hoekenga, Southfield, Mich., for plaintiffs-appellants.

William G. Albertson, Birmingham, Mich., for defendants-appellees.

Before JONES and CONTIE, Circuit Judges, and GIBSON, Senior Circuit Judge.*

CONTIE, Circuit Judge.

This appeal presents the question of whether the plaintiffs-appellants have a constitutionally protected property interest in receiving the full salary stated in their employment contracts. The district court found no such interest, and alternatively found that even if such an interest did exist, the plaintiffs had received sufficient procedural protections before their wages were reduced. For the reasons stated below, we affirm.

## I.

The plaintiffs are twelve Michigan public school teachers and their collective bargaining representative, the Wayne County MEA/NEA (WCEA). WCEA's immediate predecessor, the Woodhaven Education Association and defendant Board of Education for the Woodhaven School District (Board) were parties to a collective bargaining

agreement which expired on August 31, 1979. On June 7, 1979, the Board and the WCEA began bargaining for a new contract to govern the 1979–80 school year, but no agreement was reached by the contract expiration date. On August 27, 1979, the Board adopted a 1979–80 school calendar and adopted interim operating regulations to govern the employment relationship until a new agreement was negotiated and ratified. This initial school calendar provided for 186 teacher work days and 180 student attendance days. School commenced on September 4, 1979, with all teachers reporting for class as negotiations for a new contract continued. On March 10, 1980, however, almost all teachers failed to report for work.

On March 24, 1980, the Board requested injunctive relief in the Wayne County Circuit Court to end the work stoppage. On April 2, 1980, the court issued a temporary restraining order after finding that the teachers' strike violated sections 1 and 2 of the Public Employment Relations Act (PERA), M.C.L.A. §§ 423.201 and 423.202. The court ordered the teachers to stop striking and to recommence negotiations. When the teachers failed to return to work, the Board sought to enforce the court order. Between April 8 and April 15, 1980, thirty-five teachers were held in contempt of court. Nine teachers received thirty-day jail sentences for civil contempt. The contempt hearings were adjourned and the jailed teachers released at the school district's request. On April 13, 1980, the teachers were notified that they would be discharged under section 6 of the PERA, M.C.L.A. § 423.206, if they did not return to work on April 18, 1980. The vast majority of the teachers returned to work on that date.

After the teachers had returned, the school board unanimously adopted an amended school calendar which provided for 173 teacher work days and 167 student attendance days. Although the Board was

* The Honorable Floyd R. Gibson, Senior Circuit Judge for the Eighth Circuit, sitting by designa- tion.

advised by an employee of the State Department of Education that the Board could still schedule 180 student attendance days by holding classes on Saturday, the Board did not adopt this suggestion. The teachers were officially notified of the reduction in their individual salaries due to the shortened school year on May 2, 1980.

The WCEA filed a grievance concerning the unilateral adoption of a school calendar with less than 180 student attendance days. The grievance was processed through the four stages provided for in the interim operating conditions, and a hearing was held to allow the union to present its argument before the Board. On May 21, 1980, the Board denied the grievance. The teachers had also contended that they were entitled to individual hearings under section 6 of the PERA,[1] but the Board refused to hold such hearings.

## II.

The plaintiffs brought this action against the Board and its members in their individual capacities. Their complaint stated a variety of federal and state claims, including a cause of action under 42 U.S.C. § 1983, which alleged that the teachers were not given sufficient procedural safeguards before their salaries were reduced. The district court dismissed the majority of the plaintiffs' claims and later granted the Board's motion for summary judgment on the § 1983 claim. Only the § 1983 claim is at issue on appeal.

 The fourteenth amendment prohibits any state deprivation of life, liberty or property without due process of law. The plaintiffs contend that they have a protected property interest in receiving the full amount stated in their individual employment contracts for the 1979–80 school year. To have a protected property interest of this kind, the plaintiffs must have a legitimate claim of entitlement to their full salaries arising out of Michigan law. An abstract need or unilateral exception is not sufficient. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

The plaintiffs rely on several Michigan statutes to support their claim of a protected property interest. Their first argument is premised on the following two statutory provisions:

M.C.L.A. § 380.1231

Sec. 1231. (1) The board of a school district shall hire and contract with qualified teachers. Contracts with teachers shall be in writing and signed by a majority of the board in behalf of the district, or by the president and secretary, or by the superintendent of schools or an authorized representative of the board. The contracts shall specify the wages agreed upon.

. . . .

M.C.L.A. § 380.1232

Sec. 1232. The board of a school district, by agreement between the board and a teacher or by agreement between the board and an organization representing the teacher under Act No. 176 of the Public Acts of 1939, as amended, being 423.1 to 423.30 of the Michigan Compiled Laws, may terminate an existing contract for the services of the teacher and substitute a new contract which provides increased benefits to the teacher. The new contract shall be binding without regard to preexisting duties or obligations of either the board or the teacher under the previous contract.

The Plaintiffs argue that § 380.1231(1) gave the teachers a reasonable expectation

---

1. Section 6 of the PERA, M.C.L.A. § 423.206, provides that public employees who, in concerted action with others, in support of efforts to obtain a change in compensation or other conditions of employment, fail to render services shall be deemed on strike. If the employee is disciplined by his employer for striking, the employee is entitled, on request, to a determination of whether the employee has violated the provisions of the act. The request is to be made "within 10 days after regular compensation of such employee has ceased or other discipline has been imposed." *Rockwell v. Crestwood School District,* 393 Mich. 616, 624, 227 N.W.2d 736 (1975).

of receiving the amount stated in their employment contracts, and that the Board violated § 380.1232 by unilaterally reducing the teachers' salaries. The plaintiffs thus contend that the only conclusion to be gleaned from these two statutes is that the teachers could, at the very least, reasonably expect to receive the salary stated in their employment contracts.

■ We agree that § 380.1231(1) may have provided the teachers with a unilateral expectation of receiving their full salary; provided, of course, that the teachers fulfill their obligations under their contracts of employment. Neither statute, however, creates a legitimate claim of entitlement in this case. Section 380.1231(1) provides only that the wages to be paid a teacher shall be stated in that teacher's employment contract. It does not contain any restrictions on the Board's right to adopt an amended school calendar with an attendant reduction in the teachers' salaries due to their participation in an illegal strike. Section 380.1232 refers only to a situation in which a teacher's employment contract is terminated. The district court found no such termination, and thus ruled that § 380.1232 was not applicable to this case. The plaintiffs admit in their reply brief that no employment contracts were terminated, and argue only that the Board improperly reduced the teachers' salaries. Accordingly, we hold that the district court's finding that no employment contracts were terminated is supported by the record and the applicable law, and that these statutes do not provide the plaintiffs with a protected property interest.

■ The plaintiffs also rely on M.C.L.A. § 380.1284(1) which states that:

[t]he board of a school district shall determine the length of the school term. The minimum number of days of student instruction shall be 180. A district failing to hold 180 days of student instruction shall forfeit 1/180 of its total state school aid for each day of failure. Not later than August 1, the board of each district shall certify to the state board the number of days of student instruction in the previous school year. If the district did not hold at least 180 days of student instruction, the deduction of state school aid shall be made in the following fiscal year from the first payment of state school aid. Days lost because of strikes or teachers' conferences shall not be counted as days of student instruction.

. . . .

The Plaintiffs argue that this statute creates an absolute requirement that the Board provide at least 180 days of student instruction. If the statute requires the Board to schedule at least 180 instructional days, the plaintiffs reason, the statute must also provide the teachers with a legitimate claim of entitlement to their salaries for that period.

This argument is without merit. The district court noted that the obligation imposed by the statute is an obligation between the local school boards and the state and not between the boards and the teachers. If any intended beneficiaries of the 180-day provision can be identified, it is the taxpayers, parents and school children, rather than the teachers. Moreover, the statute itself requires only that each school district must provide a minimum of 180 instructional days in order to receive its full state aid allotment. It then establishes a pro rata formula for diminishing the amount of state aid if a school district fails to provide 180 days of student instruction within the statutory school year. Therefore, the statute itself contemplates a situation in which a school district fails to provide for at least 180 instructional days.[2]

---

**2.** The plaintiffs cite *State Board of Education v. Garden City School District,* 62 Mich.App. 376, 233 N.W.2d 547 (1975) to support their contention that the Board was required to provide at least 180 days of student instruction. This reliance, however, is misplaced. One of the statutory sections relied on by the *Garden City* court has been substantially modified to eliminate any reference to a minimum number of instructional days. *See* M.C.L.A. § 388.1613. Furthermore, the court concludes by stating that "[t]he important thing to remember about this opinion is that we specifically declare it

Having considered the plaintiffs' statutory arguments, we hold that these three statutes, either individually or collectively, do not vest the plaintiffs with a constitutionally protected property interest in receiving the full salary stated in their employment contracts.

■ The plaintiffs also rely on the collective bargaining agreement (CBA), which refers to the wage figures in the teachers' employment contracts, as a source of their protected property interest. The plaintiffs do not, however, contest the district court's finding that the CBA expired on August 31, 1979, more than eight months before the Board adopted its amended school calendar. Since the CBA had expired, the plaintiffs cannot rely on it as a source of their protected interest.[3] *See Lake Michigan College Federation of Teachers v. Lake Michigan Community College*, 518 F.2d 1091, 1096 (6th Cir.1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976). The Board did adopt a set of interim operating conditions (IOC) which incorporated many provisions of the CBA, but also provided that teachers would not be paid if they participated in an unauthorized work stoppage. Since the plaintiffs did engage in an unauthorized work stoppage, they cannot rely on the IOC as a source of their protected interest. In addition, the plaintiffs clearly state in their reply brief that they "have never recognized the effectiveness of the IOC," and have never relied on the IOC as a source of their protected property interest.

■ The plaintiffs' final source of their protected interest is the State Teacher Tenure Act, M.C.L.A. § 38.71 *et seq.* We note, however, that the plaintiffs did not use this statute as a basis for their § 1983 claim before the district court.[4] Consequently, they cannot assert it for the first time on appeal. *Roberts v. Berry*, 541 F.2d 607, 610 (6th Cir.1976); *Bannert v. American Can Co.*, 525 F.2d 104, 111 (6th Cir.1975), *cert. denied*, 426 U.S. 942, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). We therefore conclude that the plaintiffs do not have a constitutionally protected property interest in receiving the full amount stated in their individual employment contracts.

■ Even if a protected property interest could be found, this court is of the opinion that the May 19 hearing before the full Board of Education satisfied the minimum requirements of the due process clause. The hearing was the culmination of a four-step grievance procedure invoked by the plaintiffs when they filed their initial grievance on April 28, 1980. The plaintiffs presented their arguments on why the amended calendar and the attendant salary reductions should be rescinded by the Board, and the Board eventually voted to deny the plaintiffs' grievance. The plaintiffs contend, however, that the Board should have referred the matter to binding arbitration as required by the CBA. This argument is without merit. The district court correctly pointed out that the relevant inquiry in this case is not whether the

precedent for nothing." *Id.* at 381, 233 N.W.2d 547.

3. The plaintiffs contend that the CBA remained in effect after August 31, 1979 due to Art. XXV of the CBA, which provides that the terms and conditions of employment of the contract shall remain in effect until altered by mutual consent in writing between the parties. This argument does not, however, provide the plaintiffs with a protected property interest. If the CBA did not expire on August 31, 1979, the plaintiffs breached Article XVIII, Section A of the CBA (the no-strike clause) by engaging in a strike against the Woodhaven School District during the period of the agreement. It was only after the strike had ended that the Board reduced the teachers' salaries by adopting an amended

school calendar with a reduced number of teacher work days. Therefore, the plaintiffs cannot breach the CBA's no-strike clause, and later rely on the salary schedule in another section of the CBA to support their protected property interest claim.

4. The plaintiffs did not rely on the Teacher Tenure Act as a basis for their protected property interest in their motion for summary judgment. They did mention the Tenure Act in their complaint, but only in the section where they listed a portion of their pendent state claims. Thus, the plaintiffs did not use the Tenure Act to support their § 1983 claim at the trial court level.

Board satisfied any potential contractual obligation to arbitrate the grievance, but whether the grievance procedures that were afforded the plaintiffs satisfied the minimum requirements of due process.

■ The plaintiffs' final allegations are that the Board improperly refused to provide each teacher with a hearing under § 6 of the PERA, M.C.L.A. § 423.206, and that the Board breached each teachers' employment contract. We have previously ruled, however, that the plaintiffs are unable to establish a federal cause of action under § 1983. Therefore, we hold that the district court did not err in refusing to analyze the plaintiffs' pendent state claims. These claims are within the exclusive jurisdiction of the Michigan courts. *See Morse v. Wozniak,* 565 F.2d 959, 960 (6th Cir.1977); *Manchester v. Lewis,* 507 F.2d 289, 291 (6th Cir.1974).

Accordingly, the judgment of the district court is AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, concurring.

I join the majority insofar as it holds that even if the teachers have a property interest protected by the Fourteenth Amendment's due process clause, they were given all the process that was due them. Therefore, I concur in the result. Yet, because I view the property analysis under the Fourteenth Amendment quite differently than the majority, I cannot join their opinion.

I

The entire panel joins in the proposition, which disposes of this case, that even if the teachers were to prevail on the property interest issue, they cannot succeed in claiming that they have suffered a constitutional deprivation. This conclusion follows from the variable notion of due process elaborated in *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The kind of process due varies by the interest protected and the governmental interests involved. *Id.*

Later, in *Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court noted three factors that should be assessed in determining what process is due: (1) the nature of the private interest to be affected by the government action; (2) the risk of erroneous deprivation and the effect of additional safeguards; and (3) the governmental interests involved including the fiscal and administrative burdens of additional process.

In this case, a proper due process analysis suggests that the teachers are entitled to no more process than the hearing they received. Unlike many due process cases, the teachers here are not challenging the loss of their jobs or a permanent reduction in pay. Rather, after a six-week strike, they have been deprived of salary for thirteen days of work. Their interest, unlike the teacher who loses his/her job, or a welfare recipient who loses his/her means of subsistence, is small.

The hearing that was afforded the teachers, on May 19, 1980, gave them ample opportunity to voice their objections to the shortened year. They took advantage of that chance and raised their belief that a 180-day term was mandatory. It is difficult to see what else they would have done at a more extensive hearing.

Moreover, though the teachers allege that the school board's decision to shorten the year is independent from their decision to pay lower salaries, I believe the hearing was, in effect, one concerning salary. The teachers cannot on the one hand argue that the 180-day mandate is part of the broad contractual and state law scheme that provides them with an entitlement in their full pay and then argue that the school year issue and the salary issue are not intimately entwined.

Finally, the school board's interests are more significant than the teachers'. The decision to shorten the year was motivated by concern over attendance for Saturday classes and the cost-benefit analysis regarding running the schools on weekends. It is important that the board be able to make decisions concerning school calendars with relative ease and speed.

In short, given the minimal interest the teachers allege, I believe that the hearing on May 19 was enough to meet the due process standard. I reject, as does the majority, that there is any constitutional relevance to the claim that the board may have had contractual or state law obligations to give more process than they did. The constitutional standard is independent of any process granted by other means.

## II

Since I believe that there are difficult questions of state law that must be resolved before we can fully assess the property interest claim, I would decide this case on the fact that the teachers, even if they have a legitimate property interest, received all the process that was due. For that reason, I concur. Yet, because the majority reaches the property issue, I feel compelled to offer my view on that issue.

The Constitution is not the source of the property interests protected by the Fourteenth Amendment. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, we must look to an independent source, such as state law. *Id.* In both *Roth* and its companion case, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), however, the Supreme Court made clear that state and local law are not the sole source of protected property interests. Rather, a "person's interest in a benefit is a 'property' interest for due process purposes if there are ... rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* at 601, 92 S.Ct. at 2699.

Of course, every unilateral expectation does not rise to the level of a property interest for due process purposes; to be a protected interest, there must be more than a unilateral expectation, the individual must "have a legitimate claim to entitlement." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

It is important to recognize, however, that the determination as to whether there is a legitimate expectation that rises to a claim of entitlement is not to be limited by "a few rigid, technical forms." *Perry v. Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699. Rather, the notion of property interest, though not infinite, encompasses a "broad range of interests that are secured by 'existing rules or understandings'." *Id.*

The courts have recognized that contract notions are a useful guide in determining whether a property interest deserves due process protection. This theme originated in *Roth's* distinction between a unilateral expectation of and a legitimate claim to an entitlement. In making that distinction, the Court related that "it is the purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Jago v. VanCuren,* 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981); *Northeast Georgia Radiological Association v. Tidwell,* 670 F.2d 507 (5th Cir.1982).[1]

---

1. Contract notions were also essential to the analysis in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). There, the petitioner, a teacher, claimed that though there was no formal tenure system which would bind the respondent university into continuing his employment, there was an understanding that amounted to a *de facto* tenure program. The respondent contended that he legitimately relied upon guidelines and understandings that fostered the belief in that security.

The Supreme Court remanded the case to allow the petitioner an opportunity to establish the legitimacy of the expectation, stating:

A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. *Ibid.*

A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient "cause" is shown. Yet

In Fourteenth Amendment analysis, then, the Supreme Court has clearly warned that we should not apply wooden and mechanical distinctions in assessing whether there is a protected property interest. The flexible conception of property must include a fair and thorough assessment of the informal, as well as the formal, relationships between the aggrieved party and the defendant institution. Moreover, any formal agreements must be read in light of any mutual understandings or agreements that would give rise to the kind of reliance interest deemed property for due process purposes. *Roth, supra.*

### III

The majority opinion simply ignores the development of the broad Fourteenth Amendment property interest notion I have outlined above. Without citing authority other than *Roth,* and by applying a rather mechanical and formalistic analysis of the claimed sources of a property interest, the majority rejects appellants' contention. I find such a balkanized method of analysis inappropriate for appellate review.

Not only do I disagree with the balkanized analysis that the majority offers as to individual sources of expectation and en-

titlement, I believe they then fail to apply the broader analysis that we are mandated to use by virtue of decisions that build on *Roth.* To consider each source separately is to reject the view that "explicit contractual provisions may be supplemented by other agreements implied from the 'promisor's words and conduct in light of the surrounding circumstances'." *Tidwell, supra,* 670 F.2d at 511.

The teachers refer to several statutes which they allege give rise to the expectation of their full salary. In addition, they refer to the collective bargaining agreement. While it may be that none of these alone will support the reliance or expectation claim that is needed to implicate the due process clause, there is good reason to think that collectively they do provide the kind of reasonable reliance or expectation that forms the basis of a Fourteenth Amendment property interest.

The teachers cite two Michigan statutes, M.C.L.A. Section 380.1231 and M.C.L.A. Section 380.1232, which provide for the nature of the contract between the board and the teachers. The former requires that the contract be in writing and that wages shall be specified. The latter provides for amendment of the contract by the board

absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a "property" interest in re-employment. For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be "implied." 3 A. Corbin on Contracts Sections 561–572A (1960). Explicit contractual provisions may be supplemented by other agreements implied from "the promisor's words and conduct in the light of the surrounding circumstances." *Id.,* at Section 562. And, "[t]he meaning of (the promisor's) words and acts is found by relating them to the usage of the past." *Ibid.*

A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be a "common law of a particular industry or of a particular plant" that may supplement a collective-bargaining agreement, *Steelworkers v. Warrior & Gulf Co.,*

363 U.S. 574, 579 [80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409], so there may be an unwritten "common law" in a particular university that certain employees shall have the equivalent of tenure.

More recently, in *Jago v. VanCuren,* 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981), the Court reiterated that contract analysis is useful in the property interest determination. There, the Court was deciding whether to extend the use of contract notions to determinations concerning protected *liberty* interests. The Court declined to do so, but reaffirmed its position that contract notions are well suited to the property interest issue.

The Fifth Circuit also recognized the doctrine in *Northeast Georgia Radiological Assoc. v. Tidwell,* 670 F.2d 507 (5th Cir.1982). There, the Court found that there were understandings between the appellee hospital and the medical staff that benefits would not be terminated without a hearing. The Court held that this created a property interest protected by the Fourteenth Amendment. The analysis rested, in part, upon the contract notions.

and teacher or representative organization for an upward scaling of benefits. In addition, the teachers refer to M.C.L.A. Section 380.1284(1) which provides that school boards shall formulate their school calendars such that there are at least 180 days of student instruction. Finally, the teachers refer to the provisions of the collective bargaining agreement which provide for their full salaries.

The majority holds that the teachers cannot rely on the contract because the district court found, and they do not here contest, that the contract had expired. The teachers' further claim based upon the interim operating conditions (IOC) as the successor to the contract, was rejected by the majority. The majority contends that since the teachers went on strike, in violation of the IOC, they cannot rely on the IOC as a source of a property interest. (Slip op. at 827) I cannot agree with their reasoning.

In my view, this analysis misses the point; it confuses the merits of the teachers' claim to full salary with the issue as to whether that claim must be afforded due process. In the welfare cases, like *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), one need not find that the recipient is entitled to continued benefits to hold that they have a protected property interest.[2] Similarly, in dismissal cases, the determination that the employee dismissed has a due process interest is not a determination that there is no cause for dismissal, rather it is a determination that the employee's interest in his/her job is such that there must be some process afforded him/her when it is taken away.[3]

The issue as to whether due process attaches is distinct from the issue as to whether, once the process is given, the claimant will succeed on the merits; whether or not there is cause for a dismissal, or a reduction in pay, is irrelevant to whether process is due. Thus, in holding that the teachers do have a protected interest, we would not be holding that teachers are free to strike without any loss of wages. If in fact they have breached the law, or the IOC, their pay could be withheld. Yet, the due process clause ensures that this will be done by procedures that prevent an "arbitrary undermining" of one's legitimate claims to entitlement. *Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709.

Similarly, I cannot agree with the majority's analysis of the 180-day provision of M.C.L.A. Section 380.1284(1). The district court, and the majority, state that this cannot be the source of a property interest because the teachers were, at best, third or fourth-party beneficiaries of the statute. Yet, that is to misread the contract notions that serve as guides to property analysis under the Fourteenth Amendment. The teachers need not be beneficiaries, in my view, to have gathered an expectation from that statute and the practice under it. If we are to read the terms of their contract in light of the "surrounding circumstances" and "usage of the past," *Tidwell,* 670 F.2d at 510–11, rather than a resort to the balkanizing mode of analysis, then we must give more weight than the majority suggests to the statute. The teachers may have had a reasonable expectation that they would be paid their full salary in virtue of the fact that the state law, though not an absolute mandate, normally results in the board extending the term to the 180 days when exigent circumstances require.

Again, the fact that the teachers caused the loss of time is not relevant to the issue as to whether the 180-day requirement,

---

2. In cases recognizing protected property interests, courts have made clear that an interest is created when some benefit or entitlement is to be withheld only for cause; *i.e., Jeffries v. Georgia Residential Authority,* 678 F.2d 919 (11th Cir.1982) ("It is well settled that a protected property interest arises where a governmental benefit may be withdrawn only for cause."); *Vanelli v. Reynolds School Dist.,* 667 F.2d 773 (9th Cir.1982) (the Court held that

midyear dismissal of probationary teachers, when statute provides for dismissal for cause, implicates the due process clause).

3. As the First Circuit phrased it in *Bleeker v. Dukakis,* 665 F.2d 401 (1st Cir.1981), "By 'constitutionally protected,' we mean protected against discharge without appropriate procedural safeguards." 665 F.2d at 403 n. 3.

along with the other practices and customs of the district, create an interest that is afforded due process protection; rather, that fact is relevant to the merits of their claim, that is, whether or not their actions enable the board to deprive them of their salary.

In sum, I believe the majority confuses the merits of the teachers' claim to full pay with the issue as to whether they have a sufficient property interest requiring due process protection. Moreover, the majority fails to consider the overall scheme on which the teachers' claim of a property interest is based. For these reasons, I cannot join the majority's discussion on the property interest issue.