Donald R. **PARRETT**, Plaintiff-Appellee,

v.

**CITY OF CONNERSVILLE, INDIANA,** et al., Defendants-Appellants.

No. 83–1971.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1984.

Decided June 21, 1984.

Rehearing and Rehearing En Banc Denied Aug. 22, 1984.

---

Barry A. Macey, Segal & Macey, Indianapolis, Ind., for plaintiff-appellee.

Alan H. Lobley, Ice, Miller, Donadio & Ryan, Alvin E. Meyer, Stewart, Irwin, Giliom, Fuller & Meyer, Indianapolis, Ind., for defendants-appellants.

Before ESCHBACH and POSNER, Circuit Judges, and MARSHALL, District Judge.*

POSNER, Circuit Judge.

Donald Parrett, the plaintiff in this suit for damages under section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983, alleges that the defendants, an Indiana town (population 21,000) and its principal officials, took away his job as a policeman in circumstances that amounted to a deprivation of property without due process of law, thus violating the Fourteenth Amendment. A jury awarded him $320,000 in compensatory damages, plus punitive damages that the judge reduced to $68,000. The defendants, on appeal, argue principally that they did not take away Parrett's job and that in any event the grievance procedure established by the collective bargaining agreement between the town and a union representing the town's policemen provided all the process that was due him.

Parrett had been for many years chief of detectives in Connersville. In 1976 he had investigated a forgery of bank checks and

* Hon. Prentice H. Marshall of the Northern District of Illinois, sitting by designation.

the investigation had led to the daughter of a prominent citizen of the town, Jim Cordes. Cordes had denied to Parrett that his daughter was guilty, and Cordes and Parrett had had an angry exchange over the matter. Cordes' daughter was not prosecuted. In 1979 Frederick Bunzendahl was elected Mayor of Connersville, and he made Jim Cordes the city attorney. Defendants Bunzendahl, Cordes, and John Nichols constituted the town's Board of Public Works, which administers the police department. Even before the new administration took office, Cordes asked Parrett to quit as chief of detectives; and when Parrett refused, Cordes began efforts (which failed) to find evidence of misconduct by Parrett during his many years as captain of detectives. Cordes made no secret of the fact that he was "going to get Don Parrett" because of the way Parrett had investigated the charges involving Cordes' daughter.

·The newly constituted Board of Public Works met for the first time on January 3, 1980, and as its first order of business unanimously approved a resolution that Parrett be removed as chief of detectives and transferred to the uniformed force as "line captain" without reduction in pay. But the new police chief, defendant Stevens, acting on instructions from Cordes, told Parrett that he would not be assigned any police duties as "line captain." He was given a windowless room to sit in that formerly had been a storage closet. The room had a desk and chair but no other furniture and no telephone. Parrett spent his shift sitting at the desk with nothing to do. The enforced idleness got on his nerves in a most serious way. He was hospitalized on April 3 with symptoms of nervous collapse that included cardiac abnormalities. He never returned to "work," and on June 1 took medical retirement from the police force. There is no suggestion that cause existed to remove Parrett from the police force. Indeed, no reason is suggested why he was removed from his office as chief of detectives, an office he had apparently filled with distinction, other than Cordes' animosity toward him stemming from a personal incident that should, as a matter of ethics if not law, have disqualified Cordes from participating in any personnel action concerning Parrett.

█ Parrett does not argue that his transfer from chief detective to line captain deprived him of property within the meaning of the Fourteenth Amendment. In *Lyznicki v. Board of Education,* 707 F.2d 949, 951 (7th Cir.1983), we expressed doubt whether a lateral transfer, involving no loss of pay, could ever be sufficient deprivation to violate the Fourteenth Amendment. A contrary conclusion would subject virtually all personnel actions by state and local government agencies to potential federal damage suits under 42 U.S.C. § 1983 —a breathtaking expansion in the scope of that already far-reaching statute, and one remote from the contemplation of its framers. Cf. *Brown v. Brienen,* 722 F.2d 360, 365 (7th Cir.1983). But we need not attempt to lay the question to rest in this case. A property right in a particular office in state or local government could exist only by virtue of state or local law. See *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). And Ind.Code § 18–1–11–1 (since repealed) empowered the Board of Public Works to dismiss detectives at any time, without notice or hearing as required for other police officers. As Parrett thus had no security of tenure as a detective, his transfer to the uniformed force could not have deprived him of a property right within the meaning of the Fourteenth Amendment. Indeed, it is possible to read the statute as empowering the Board to dismiss a detective outright, rather than just return him to the uniformed force; and if so, and the Board had done that, Parrett would have no federal claim of any kind.

█ But that is not what the Board did. It returned Parrett to the uniformed force; and when Ind.Code § 18–1–11–1 is read together with Ind.Code § 18–1–11–3, it is apparent that Parrett had tenure as a police officer after he was demoted from chief of detectives to line captain in the

uniformed force. Section 18–1–11–3 (now section 36–8–3–4(b)) provides that every member of the uniformed police force shall hold office until removed by the board and that he may be removed for any cause other than politics but only after notice and hearing. This is secure enough tenure to confer a property right under the Fourteenth Amendment. See *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir. 1983).

Parrett argues that he was "constructively discharged"; that is, that his working conditions were made so miserable that he was forced to quit. See *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980); *Clark v. Marsh,* 665 F.2d 1168, 1175–76 (D.C.Cir.1981); *McAdoo v. Lane,* 564 F.Supp. 1215, 1221 (N.D.Ill.1983); Annot., 55 A.L.R. Fed. 418 (1981). If that is what happened he was deprived of property within the meaning of the Fourteenth Amendment, and the only question would then be whether he was given due process of law.

■ To pay a man without asking him to do any work in exchange might appear to be the antithesis of constructive discharge—might appear to make his "working" conditions paradisal rather than infernal. This might well be true if the work was dirty, dangerous, unhealthy, backbreaking, repetitive, or otherwise disagreeable, or if the worker had the personality of a remittance man. But as a former chief of detectives, still young, Parrett was not a drudge or a time-server but an ambitious professional. Enforced idleness was not only a humiliating counterpoint to his years as detective chief but would if prolonged have depreciated his professional skills to the point where it would have been difficult for him to work his way back, in Connersville or elsewhere, to a responsible position. For anyone with some self-respect the position that Cordes and the other defendants placed Parrett in was intolerable; even if his health had not collapsed under the strain, he would have had to quit. The responsibility for his leaving was thus the defendants'. They argue, with

support in the record, that Parrett was willing to work as a patrolman and only balked at buying a new uniform, even though he had received a uniform allowance a month before his removal as chief of detectives. But the jury was entitled to find, as we must assume it did, that it would have been an utterly futile expenditure for Parrett to have bought a new uniform (or have dyed his old uniform, which he had worn before becoming a detective many years earlier, in the police department's new colors), given the defendants' determination that Parrett should do no police work but just twiddle his thumbs in the closet.

■ The precise dating of the constructive discharge is not important—provided it did not occur as soon as Parrett was transferred to the uniformed force. For then there might have been no interval during which he had a property right that he could be deprived of—assuming that section 8–1–11–1 really was intended to allow the Board of Public Works to dismiss detectives outright, without cause, rather than just return them to the uniformed force. But in any event his constructive discharge did not occur quite that immediately. Not until it became clear to him that he would not be given any work to do could he be said to have been constructively discharged. So long as the discharge did not occur immediately it is not important exactly when it did occur. Even if it was not till Parrett was hospitalized in April or took medical retirement in June, the jury was entitled to find that the hospitalization and medical retirement were consequences of the measures that the defendants had taken to make Parrett's life at work intolerable. It is true as the defendants point out that there were other sources of strain in Parrett's life, but again the jury was entitled to find that these would not have pushed him over the brink and hence that the defendants' conduct caused, in a tort sense, the illness that drove Parrett into retirement. Nor is it significant that a man with stronger nerves might not have reacted as Parrett did. The tortfeasor

must take his victim as he finds him. E.g., *Stoleson v. United States*, 708 F.2d 1217, 1221 (7th Cir.1983); *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (1891). These are general principles of causation in tort law but they are applicable to constitutional torts litigated under section 1983. See *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983), and cases cited there; cf. *Beard v. O'Neal*, 728 F.2d 894, 898–99 (7th Cir.1984). The defendants may not have wanted to make Parrett ill, but it is enough to fix liability on them for the costs of his illness that they wanted and took measures to make his position on the police force intolerable and that he became ill as a consequence, though presumably not as a desired or foreseen consequence.

Although *Martinez v. California*, 444 U.S. 277, 281, 285, 100 S.Ct. 553, 557, 559, 62 L.Ed.2d 481 (1980), may seem to suggest that special rules of causation apply in a constitutional-tort case, we think that decision actually rests on a different principle altogether. The case involved an attempt to fasten liability under section 1983 on parole board members for the wrongful death of the plaintiff's decedent at the hands of a prisoner whom they had paroled, allegedly with reckless disregard to his dangerousness. The Court held that these allegations did not state a claim under section 1983. The point was not that the defendants had not, in some sense recognized by tort law, caused the death of the plaintiff's decedent; the Court acknowledged that they might have. 444 U.S. at 285, 100 S.Ct. at 559. It was rather that since the Constitution does not create a duty to protect the public safety, there was no basis even for prima facie liability. See *id.*; *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982); *Jackson v. City of Joliet*, 715 F.2d 1200, 1203–05 (7th Cir.1983); *Beard v. O'Neal, supra*, 728 F.2d at 899. Nothing in any of these cases suggests to us that if a plaintiff succeeds in proving a violation of his constitutional rights, the principles used to determine whether he has demonstrated that the violation caused the injury for which he is seeking damages should be other than those applied in ordinary tort cases.

The fact that Parrett was deprived of property within the meaning of the Fourteenth Amendment is not the end of the analysis, of course; he must also show that he was denied due process of law. Although he was not given a judicial or administrative hearing, the defendants argue that he received due process of law by virtue of the grievance procedure in the collective bargaining contract between the union representing the city's policemen and the city. The agreement authorized the police chief to "transfer" policemen freely, but "To suspend, demote, discharge or take other disciplinary action" against them only "for just cause." However, the agreement also disclaimed any purpose of interfering with any city official's statutory responsibilities. The agreement further provided for arbitration of disputes; and on January 11, 1980, shortly after Parrett was transferred to the uniformed division, the union filed a grievance with the arbitrator on Parrett's behalf, complaining not only of the transfer but also of the police department's refusal to assign any police duties to Parrett after the transfer. A hearing was held on May 8 at which the arbitrator ruled that he would not consider any evidence relating to events after the transfer, including the refusal to assign Parrett any police duties. On July 18 the arbitrator rendered his decision, which was that the transfer did not violate the collective bargaining agreement. The transfer was not a dismissal within the meaning of the Indiana statutes incorporated by reference in the collective bargaining agreement, but merely a "transfer."

With this result Parrett has no quarrel, at least in this case. Since he had no tenure as chief of detectives, he cannot and does not contend that his removal from that post is actionable under section 1983. But the defendants argue that the grievance machinery created by the collective bargaining contract provided him with all the process that was due him in respect of his constructive discharge: an opportunity

for a hearing before an impartial tribunal. Realistically, the opportunity was for a hearing only after he was constructively discharged. The hearing before the arbitrator took place on May 8; the last possible date of Parrett's constructive discharge was June 1, the day he took medical retirement; and it is unlikely, to say the least, that if Parrett had filed a new grievance after May 8 (the earliest day on which he had reason to believe that the arbitrator would not consider, as part of the original grievance, the conditions precipitating his discharge) it would have been adjudicated before his discharge. But due process does not always require pretermination hearings. See, e.g., *Brown v. Brienen, supra,* 722 F.2d at 365–66, and cases cited there. The defendants point out that it would be disruptive of orderly labor relations under a collective bargaining agreement to allow an employee to bypass the grievance machinery set up by the agreement and litigate his dispute with his employer as a civil rights suit.

■ There is authority that the procedure for dispute resolution created by a collective bargaining agreement can indeed satisfy the requirement of due process of law. See *Jackson v. Temple University,* 721 F.2d 931, 933 and n. 2 (3d Cir.1983); *Lewis v. Hillsborough Transit Authority,* 726 F.2d 664, 667 (11th Cir.1983) (per curiam); *Ash v. Board of Education,* 699 F.2d 822, 827 (6th Cir.1983). In *Lewis* the precise method of dispute resolution created by the agreement is unclear; in *Ash* the plaintiff received a hearing before the Board of Education; but *Jackson* involved arbitration, and held squarely, and very sensibly as it seems to us, that a hearing before an arbitrator can satisfy constitutional requirements. Although the framers of the Fourteenth Amendment and of section 1983 (the source of the damage remedy for violations of the Fourteenth Amendment) could not have foreseen the rise of public-employee unions, grievance procedures, and other phenomena of modern labor relations (executory agreements to arbitrate were not even judicially enforceable in 1871, see *Hayes v. Allstate*

*Ins. Co.,* 722 F.2d 1332, 1339 (7th Cir.1983) (dissenting opinion)), the concept of due process is sufficiently flexible to allow the courts to work out an accommodation between the interest in an orderly system of labor relations in the public sector as elsewhere and public employees' interest in procedural protections of job rights classified as property rights. The standard test of procedural adequacy under the due process clause, that of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), merely requires a comparison of the costs and benefits of giving the plaintiff a more elaborate procedure than he actually received. There is no basis under this test for blanket disqualification of arbitration, which businesses often use to resolve multi-million dollar disputes, and which is the standard method of protecting job security in unionized plants and facilities in the private sector. If the dispute is the type for which arbitration is well suited—and disputes over job rights fit that bill—then the gains from additional procedure, in reducing the chance of error, may well be smaller than the costs of additional procedure, especially when are added to the direct costs the indirect costs in disrupting orderly labor relations by bypassing the grievance procedure set up by a collective bargaining agreement.

■ It is true that the cases we have cited for the proposition that procedures established under collective bargaining contracts, including arbitration, can satisfy the requirements of due process of law were decided before the Supreme Court in *McDonald v. City of West Branch,* — U.S. ——, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), held that a labor arbitrator's findings may not be given collateral estoppel effect in a civil rights suit. This may appear to close the door to the defendants' due process argument, since a holding that the proceeding before the arbitrator provided all of the process that was due an employee would extinguish his claim to have been deprived of his job unconstitutionally just as effectively as would giving the arbitrator's finding that he was fired for cause collateral

estoppel effect. But McDonald did not argue that he had been denied due process of law in the sense of fair procedure; he argued that he had been fired for exercising his rights under the First Amendment. It is no defense to a claim of infringement of the liberties protected by the First Amendment that the procedure was fair, but it is a defense to a claim of deprivation of property, since such a deprivation is permitted by the due process clause provided there is no denial of due process. *McDonald* does not decide whether an arbitration proceeding can satisfy the requirements of due process of law, and does not undermine the decisions that hold it may.

■■■■ But the particular proceeding in this case did not, in fact, satisfy those requirements. The arbitrator's refusal to consider post-transfer evidence, which is to say evidence that Parrett had been constructively discharged, was not announced till May 8, 1980, and it would not have made sense for Parrett to file another grievance before then. Until then he thought the issue of constructive discharge was under consideration by the arbitrator. Moreover, if he had won on his main claim and been reinstated as chief of detectives, his constructive discharge from the uniformed force would have become moot. If Parrett had filed a new grievance after May 8—even immediately after—then, judging by the length of time it took the arbitrator to decide the transfer question, which involved no factual issues, it would probably have been 1981—a year after the alleged discharge occurred—before the arbitrator decided the validity of the constructive discharge. By May 8, 1980, moreover, Parrett had been driven from his job into a hospital, and he took medical retirement before the arbitrator decided the transfer question.

The fact that the grievance machinery worked so sluggishly in this case might not be determinative if the arbitrator could, in a separate grievance proceeding on Parrett's constructive discharge, have awarded Parrett his full common law damages, which, with the exception of general damages, are recoverable in section 1983 cases. See, e.g., *Freeman v. Franzen*, 695 F.2d 485, 492–94 (7th Cir.1982). The defendants do not argue that ill health resulting from being fired (actually or constructively) in violation of section 1983 is not compensable. But so far as the record shows the arbitrator could not have given Parrett any damages beyond restoring the pay he lost after June 1 when he took medical retirement. The arbitrator's inability fully to compensate Parrett made it all the more important that the arbitrator be able to prevent harm from accruing to Parrett in the first place. See, e.g., *Simmons v. Drew*, 716 F.2d 1160, 1164 (7th Cir.1983). But as a result of the delay in hearing the case the arbitrator was unable to act until the harm was done.

Thus, this is not a case like *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), or *Brown v. Brienen*, *supra*, 722 F.2d at 369, where the existence of an adequate state remedy under tort or contract law for the alleged deprivation satisfied the requirements of due process of law even though the remedy was not available until a deprivation had occurred. The problem here is not that union grievance machinery is not a state remedy, for as the product of a collective bargaining agreement with a city it is, or that it is inherently inadequate, for it is not, but that as administered in the present case it could not protect the plaintiff's property right in his job as a police officer. This is not to say that arbitration cannot satisfy the requirements of due process unless the arbitrator is empowered to award full common law damages. But if he cannot, then he must be able to prevent the harm to the grievant before it occurs, which requires faster action than was taken by the arbitrator in this case.

■■■■ The defendants make a number of other arguments, most of which however are frivolous and therefore require no comment by us. But the defendants do point out two genuine errors in the instructions. First, the jury was instructed that due process of law forbade that Parrett

should be deprived of his job without a hearing. The instruction should have read, without an *opportunity* for a hearing, since it was the defendants' contention that Parrett could have gotten a constitutionally adequate hearing by filing another grievance after May 8 or a more comprehensive one initially. Although the jury certainly was entitled to reject the argument that the grievance machinery satisfied the defendants' obligation to provide Parrett due process of law, we are not prepared to say that the question should have been withdrawn from the jury, which conceivably the wording of the instruction did. Second, the instruction on the defendants' qualified immunity from liability did not follow the "objective reasonableness" standard of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), decided shortly before the trial in the present case, but instead the superseded standard of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which allowed the jury to reject the immunity defense if it found that the defendants were acting in bad faith, however objectively reasonable their conduct may have been.

 Now it is very doubtful that either of these errors, or for that matter both together, could have affected the outcome of the trial. The defendants made little at trial of the argument they press on appeal that Parrett waived his constitutional right to due process of law by failing to file a second grievance; and the conspiracy orchestrated by Cordes to take revenge on Parrett for having investigated alleged criminal misconduct by Cordes' daughter was not only wicked, but objectively unreasonable. But in any event the defendants did not object to the instructions that they now contend were erroneous; and this omission bars them under Rule 51 of the Federal Rules of Civil Procedure from complaining about these errors to us.

 True, we once ordered a new trial upon finding "a series of the instructions to be plain error which, taken together with the charge as a whole under the circumstances of this case, seriously affect-

ed the fairness of the proceeding." *Iskander v. Village of Forest Park*, 690 F.2d 126, 130 (7th Cir.1982). However, as the wording indicates, the circumstances have to be extraordinary; this circuit does not recognize a blanket plain-error exception in civil cases. See *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 549 (7th Cir.1982), and cases cited there. To put a successful plaintiff (or defendant) to the expense of another trial because his opponent's lawyer failed—or maybe for tactical reasons deliberately omitted—to object to an instruction would be terribly unfair to the winning party and to the trial and appellate courts. The burden of the error should normally fall on the party whose lawyer caused it. The present case ranged an individual against a town and some of its leading citizens. The cost of the errors made by the defendants' counsel (errors which may in any event have been harmless—and maybe that is why they were not caught before the jury was instructed) should not be visited on the plaintiff. See *Capitol Indemnity Corp. v. Keller*, 717 F.2d 324, 329 (7th Cir.1983).

The judgment entered for the plaintiff is AFFIRMED.