**Norman ARMSTRONG,
Plaintiff–Appellant,**

**v.**

**Edward R. MEYERS, in his capacity as Manager of the Mail and Messenger Service, University of California at Los Angeles; Raymond Schultze, in his capacity as Administrative Vice Chancellor, University of California at Los Angeles, Defendants–Appellees.**

**No. 91–55101.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 7, 1992.

Decided May 19, 1992.

Cecil Marr and Diane Marchant, Marr & Marchant, Los Angeles, Cal., for plaintiff-appellant.

Fred Takemiya, Office of the General Counsel, University of California, Oakland, Cal., for defendants-appellees.

Before WALLACE, Chief Judge, BROWNING, Circuit Judge, JONES, District Judge.*

PER CURIAM:

Norman Armstrong filed suit under 42 U.S.C. § 1983 alleging he was discharged from his job at the University of California at Los Angeles (UCLA) without due process. The district court granted summary judgment for the defendants. We affirm.

## I

The University fired Armstrong, an employee in its Mail and Messenger Service department, because he was unable to perform his duties for medical reasons. Armstrong requested a hearing to contest his termination but was told his only recourse was the grievance/arbitration procedure established by the collective bargaining agreement between UCLA and his union, the American Federation of State, County and Municipal Employees (AFSCME).

Under the agreement, an employee is entitled to notice and an opportunity to respond before being terminated. Armstrong does not dispute this pretermination procedure was followed. If the employer adheres to its decision to dismiss the employee, the employee may contest the decision by submitting a grievance.

The post-termination grievance process consists of three steps. At Step 1, the employee's supervisor reviews the employee's complaint and responds in writing. At Step 2, the grievance is presented to a higher university official. This official must discuss the grievance with the employee and the employee's representative, if any, and issue a written response. At Step 3, the assistant vice president for labor relations, or the vice president's designee, reviews the grievance and issues a written decision. Armstrong went through all three steps of the process without success.

Under the agreement, the union has the exclusive right to appeal an adverse Step 3 decision to binding arbitration. At the arbitration hearing, both sides may introduce evidence, call and cross-examine witnesses, and submit written briefs. After the hearing, the arbitrator is required to issue a written decision resolving the dispute.

Armstrong asked AFSCME to take his dispute to arbitration. The union initially requested arbitration; UCLA acknowledged the request. The union later decided not to take the grievance to arbitration because it "lacked sufficient merit." Armstrong appealed to the AFSCME Council 10 Appeals Panel. The Appeals Panel decided not to take the grievance to arbitration, but told Armstrong the union "was willing to allow Mr. Armstrong to proceed at his own cost," and notified Armstrong of the deadline for scheduling an arbitration hearing. Armstrong took no action. When the deadline for scheduling an arbitration hearing passed, UCLA sent Armstrong notice it considered the matter closed.

Armstrong brought suit under 42 U.S.C. § 1983, alleging he had been deprived of property without due process of law. He named as defendants Edward Meyers, the manager of UCLA's Mail and Messenger Service; Raymond Schultze, UCLA's Administrative Vice Chancellor; and the Regents of the University of California. The district court dismissed the case as to the Regents, and granted summary judgment as to the remaining defendants, holding Armstrong had not been denied due process. Armstrong appeals.

## II

### A

The district court correctly dismissed Armstrong's suit against the Regents. The Regents, a corporation created by the California constitution, is an arm of the state for Eleventh Amendment pur-

---

* Honorable Robert E. Jones, United States District Judge for the District of Oregon, sitting by designation.

poses, and therefore is not a "person" within the meaning of section 1983.[1] *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1442–43 (9th Cir.1989) (affirming dismissal of section 1983 suit against Regents).

## B

■ We review de novo the district court's summary judgment in favor of the remaining defendants. *In Re Bullion Reserve of North America*, 922 F.2d 544, 546 (9th Cir.1991).

The parties agree that Armstrong had a property interest in continued employment protected by the Fourteenth Amendment. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985). Armstrong contends the grievance/arbitration procedure established by the collective bargaining agreement failed to provide due process because only the union could take Armstrong's grievance to arbitration, and the union refused to do so.[2]

■ "[D]ue process is flexible and calls for such procedural protections as the particular situation demands," *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citation omitted). A public employer may meet its obligation to provide due process through grievance procedures established in a collective bargaining agreement, provided, of course, those procedures satisfy due process.[3]

■ Three factors are to be considered in determining whether a particular procedure satisfies due process:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. at 903.

■ Armstrong's interest in keeping his job is substantial. *See Loudermill*, 470 U.S. at 543, 105 S.Ct. at 1494 ("the significance of the private interest in retaining employment cannot be gainsaid"). However, the risk of an erroneous determination in the grievance/arbitration procedure is not large, and the value of additional or substitute procedures is not great. Grievance/arbitration procedures are a universally accepted method of resolving employment disputes, included in countless collective bargaining agreements. Although Armstrong's union could and did decide not to take Armstrong's claim to arbitration, it did so under a duty of fair representation, and may be sued for breach of that duty if its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17

---

**1.** Every *person* who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.... 42 U.S.C. § 1983 (emphasis added).

**2.** The union told Armstrong he could proceed to arbitration on his own, but Armstrong asserts he could not afford the costs. Viewing the evidence in the light most favorable to the party against whom summary judgment was granted, *In re Bullion Reserve*, 922 F.2d at 546, we assume allowing Armstrong to proceed only if he paid the hearing costs was the same as refusing to take Armstrong's claim to arbitration.

We note that Armstrong challenges the grievance/arbitration procedure as constitutionally inadequate on its face. *Cf. Parrett v. City of Connersville, Ind.*, 737 F.2d 690, 697 (7th Cir. 1984) (post-termination procedure was adequate on its face to provide due process, but not "as administered in the present case"). He does not allege, for example, that the defendants were involved in the union's decision not to take his claim to arbitration. *See Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d Cir.1983) (because employer was not involved in union's decision not to arbitrate grievance, employer did not deny plaintiff due process).

**3.** *See Narumanchi v. Bd. of Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2nd Cir.1988); *Parrett*, 737 F.2d at 696–97; *Lewis v. Hillsborough Transit Auth.*, 726 F.2d 664, 667 (11th Cir.1983); *Ash v. Bd. of Educ. of Woodhaven School Dist.*, 699 F.2d 822, 827–28 (6th Cir.1983).

L.Ed.2d 842 (1967).[4]

There is a strong public and private interest in maintaining an effective grievance/arbitration process to settle disputes between employers and employees. Allowing individual employees to decide which claims to arbitrate would undermine that process:

> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

*Vaca*, 386 U.S. at 191–92, 87 S.Ct. at 917–18 (footnote omitted); *See also International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 51, 99 S.Ct. 2121, 2127, 60 L.Ed.2d 698 (1979) ("union discretion [in determining what grievances to arbitrate] is essential to the proper functioning of the collective-bargaining system"). Exclusive union control of the grievance process as the employees' sole representative also helps achieve one of the primary purposes of the process:

> A prime function of a grievance procedure is to secure uniformity in interpreting the agreement and building up a "law of the plant" with respect to matters not spelled out in the agreement. . . . Vesting the Union with control of all grievances increases the likelihood of uniformity and reduces "a potential source of competitions and discriminations that could be destructive of the

entire structure of labor relations in the plant."

*Winston v. United States Postal Service*, 585 F.2d 198, 208 (7th Cir.1978) (quoting *Ostrofsky v. United Steelworkers of America*, 171 F.Supp. 782, 790–91 (D.Md. 1959)).

The Seventh and Third Circuits have held that grievance/arbitration procedures like those involved in this case provide due process to terminated employees. *See Winston*, 585 F.2d at 210; *Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3rd Cir.1983). The collective bargaining agreement involved in *Winston* provided a three-step grievance process with appeals to successively higher levels of management. 585 F.2d at 200. The employees completed this process, but their terminations were not rescinded. *Id.* They asked their union to take their grievances to arbitration, because, under the collective bargaining agreement, only the union had this power. The union declined to do so. *Id.* at 200–01. The court held that the procedure was consistent with due process, stating that the employees "could have sued the Union for breach of its duty to fairly represent them if the refusal to demand arbitration was not in good faith." *Id.* at 209–10. *See also Jackson*, 721 F.2d at 933 (right to ask union to take grievance to arbitration provided adequate due process safeguard). We follow these decisions.

Armstrong argues *Winston* relied on the now-discredited "bitter-with-the-sweet" approach to due process adopted by the plurality in *Arnett v. Kennedy*, 416 U.S. 134, 152–54, 94 S.Ct. 1633, 1643–44, 40 L.Ed.2d 15 (1974), and is therefore of doubtful authority. *See Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1492–93 (rejecting approach of *Arnett* plurality). It is clear, however, that the court in *Winston* did not rely on the approach of the *Arnett* plurality. *See Winston*, 585 F.2d at 209 n. 30 (expressly

4. Because Armstrong works for the State of California, his union is exempt from the coverage of the National Labor Relations Act, *see* 29 U.S.C. § 152(2), and consequently from the federal duty of fair representation described in *Vaca*. However, a duty of fair representation applicable to unions representing employees of state universities has been created by California statute, *see* Cal.Gov't.Code § 3578, and the California courts look to federal law in interpreting the state duty of fair representation. *See, e.g., Logan v. Southern Cal. Rapid Transit Dist.*, 136 Cal.App.3d 116, 128–29, 185 Cal.Rptr. 878, 885–86 (1982).

rejecting approach of *Arnett* plurality). *Winston* has been cited approvingly by the Seventh Circuit since *Loudermill.* *See, e.g., Roman v. United States Postal Service,* 821 F.2d 382, 386 (7th Cir.1987).

Armstrong's reliance on *Rankin v. Independent School Dist. No. I-3,* 876 F.2d 838 (10th Cir.1989) is misplaced. The issue in *Rankin* was whether a discharged teacher who was entitled to a post-termination hearing under state law could be required to pay half the costs of the hearing. *Rankin* did not decide whether providing such a hearing at the request of the employee was required by the Due Process Clause. *See id.* at 839 n. 2 ("We are *not* here concerned with the nature of the process due Rankin.") (emphasis added).

AFFIRMED.