USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-2005 STANLEY DIAZ-GANDIA, Plaintiff, Appellant, v. MARIA ROSA DAPENA-THOMPSON, ET AL., Defendants, Appellees.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Aida M. Delgado-Colon, U.S. Magistrate Judge] _____________________  ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________  ____________________ Rafael A. Oliveras Lopez de Victoria for appellant. ____________________________________ Lorraine J. Riefkohl, Assistant Solicitor General, with whom ____________________ Carlos Lugo-Fiol, Solicitor General, and Jacqueline Novas-Debien, ________________ _______________________ Deputy Solicitor General, were on brief for appellees.  ____________________ July 25, 1996  ____________________ CYR, Circuit Judge. This appeal challenges a summary CYR, Circuit Judge. ______________ judgment dismissing various claims brought under the Veteran's Reemployment Rights Act of 1968 ("VRRA") against the Right to Work Administration of the Commonwealth of Puerto Rico ("RWA") for allegedly denying plaintiff-appellant Stanley Xavier Diaz Gandia ("Diaz") certain incidents and advantages of employment solely by reason of his participation in the United States Army Reserves. We vacate the district court judgment and remand for further proceedings.  I I BACKGROUND1 BACKGROUND __________ Appellant Diaz, who possesses a Bachelor's Degree in Psychology and a Masters Degree in Vocational Counseling, was hired by defendant-appellee RWA in August 1980, as an Occupa- tional Counselor I in its Bayamon Regional Office. During the next few years he was promoted and transferred several times before attaining the classification of Personnel Relations Counselor, equivalent to Occupational Counselor III, at the Central Office in San Juan. In September 1986 Diaz enlisted in the United States Army and entered on active duty for approximately nine months, receiving military leave pay from the RWA as required by Puerto Rico law. P.R. Laws Ann. tit. 25 2082. Following his honor-  ____________________ 1We view all competent evidence and attendant reasonable inferences in the light most favorable to Diaz, the party resist- ing summary judgment. McCabe v. Life-Line Ambulance Serv., Inc., ______ _______________________________ 77 F.3d 540, 544 (1st Cir.), petition for cert. filed, 64 U.S.- ________ ___ ____ _____ L.W. 3808 (U.S. May 29, 1996) (No. 95-1929).  2 able discharge in May 1987, he became an active reservist with the 448th Engineer Battalion at Fort Buchanan, which meant that he remained on paid military leave from the RWA until July 1987. When Diaz reported for duty with the RWA at its Central Office following his return from active duty with the Army Reserves, he discovered that a person with inferior educational qualifications and experience had been assigned to fill his position. Nevertheless, as directed, Diaz reported for work as an Occupational Counselor III in the San Juan Regional Office, located in the same building, where for one month he was assigned to a cubicle filled with boxes and office supplies but no desk or chair. He complained to the Office of Reservist and Veteran's Affairs, and, in March 1988, to the Board of Appeals of the Commonwealth Personnel Administration System, all to no avail. Approximately two months later, a complaint to the Employee's Association resulted in his reassignment to the Central Office as a Counselor in the Business Development Area.  In addition, Diaz was reprimanded unjustly by his supervisors on two occasions upon his return from military leave. First, he states that the Director of the San Juan Regional Office, Aida Iris Castro Mundo, informed him that he wasted a lot of time on military exercises. Following their meeting, Diaz received a letter from Castro Mundo, dated April 15, 1988, advising that he needed to improve his job performance in light of the fact that he had: delayed assigning cases to other 3 counselors; refused to receive cases after 3:30 p.m.; frequently absented himself from his workplace during office hours; failed to complete cases on time; and either failed to perform, or performed poorly, various other official responsibilities. Diaz denies these accusations. Second, at his deposition Diaz testi- fied that he had been reprimanded unfairly by another supervisor, Jose Figueroa, for not being at his work station during the middle of a day following his return from military training. He explained his four-hour absence on that occasion as having been devoted to making sure the RWA paid him for the time he was on military leave. Diaz further states that he received no job description until July 1994, despite a promise six years earlier that he would receive one, and that his supervisors harassed him by evaluating his work performance absent a job description.  No other negative job evaluation appears in Diaz' personnel record. Nonetheless, and though in June 1988 he had been designated a Counselor of Special Projects in the Central Office as he requested, Diaz testified that Supervisor Fernando Freses made him uncomfortable with jokes about the military and its exercises, and that he so informed Freses. When asked on deposition whether it was a joke, Diaz replied: "It was like a joke, but I did not know what that would lead to. Because maybe behind the words, well, there could be other intentions . . . ."  Diaz testified that his desk and belongings were relocated four times before or during military leaves in 1991 alone, though there was no change in work duties. For example, 4 in July 1991, without warning and after submitting a request for military leave, his desk was set apart from co-workers until he complained to his supervisor. When he returned from military leave the following month, however, his desk had been removed to the Training Division on the same floor. Diaz was told by the supervisor that this was a temporary measure, necessitated by a remodeling project. But when he returned from leave again in September 1991, after the remodeling had been completed, his desk had been relocated again, this time to the Payment Division. Once again he was told by his supervisor that the move was temporary. Upon his return from military leave in November 1991, his desk was located in the Learning Program Division, ostensibly as an emergency measure related to space problems.  The remodeling plans for the Communal Development Division included no work station for Diaz, even though work stations were provided for two co-workers who had arrived after Diaz.2 As a consequence, Diaz remained in the Learning Program Division until the end of May 1992. Finally, unlike all his co- workers in the Learning Program Division and in the Communal Development Division, Diaz was not provided a telephone. Super- visor Jose Figueroa explained to Diaz in March 1992: "Oh, you do not have a telephone because the day the telephone company operator came you were in [sic] one of these [sic] damn military leaves of yours." In late March 1992, Diaz complained to his  ____________________ 2In October 1989, the Special Projects Area became the Communal Development Division.  5 supervisor that all his work duties had been reassigned to others.  Around the same time, he complained of migraine head- aches and the State Insurance Fund ordered home rest from April 10 to May 18, 1992. Upon returning from medical leave, Diaz was given no work assignment for approximately two weeks. The following month he was transferred to the Participant Services Division in the Central Office, located on the tenth floor of the same building. After protesting the transfer and requesting administrative review, he reported as directed to the Participant Services Division upon returning from another military leave and was informed that there was no work for him to do. Approximately one week later, having been given no work assignment, he com- plained to the State Insurance Fund that he was experiencing insomnia, headaches and neck and back pain. A private psychia- trist prescribed two weeks' rest. Subsequently, another psychia- trist evaluated Diaz, concluding that he suffered from dysthymia with anxiety somatization.3  On August 6, 1992, having been assigned no work for five consecutive weeks, during a ten-week period, Diaz received a copy of a letter, dated July 24, 1992, from the manager of Participant Services to the director of Occupational Orientation,  ____________________ 3Dysthymia: "any despondent mood or depressive tendency, often associated with hypochondriasis." Blakiston's Gould __________________ Medical Dictionary 420 (4th ed. 1956). Somatization: "the ___________________ neurotic displacement of emotional conflicts onto the body, resulting in various physical symptoms or complaints . . . ." Id. at 1266. ___ 6 advising that Diaz should be given work as an Occupational Counselor, at an unspecified grade level. Only then was he given work duties. In September 1992, he was instructed to "read" a 200-page statute in three days, but found the task too demanding as he had been prescribed Prozac, then "something else with a lithium base," and finally Xanac, by his psychiatrist. At Diaz' request, the director of Occupational Orientation later reduced the assignment to twenty-five pages per day. Diaz testified that other incidents also made him "feel very bad because . . . all this mess, of the Army Reserve and the drills, this was all going to continue. And this was going to be a nightmare until I left the Army or until I left this agency, this was going to contin- ue."  On July 16, 1993, Diaz filed suit against defendants- appellees Maria Rosa Dapena-Thompson and her successor, in their respective official capacities as the RWA director, alleging that he had been harassed, denigrated, and persecuted after returning from military leave for required training and drills with his reserve unit. He demanded damages for mental and emotional suffering, as well as reclassification in accordance with RWA rules and regulations. Shortly after filing the complaint, Diaz was promoted to Occupational Counselor IV, the highest grade he has ever attained.  In due course, defendants moved for summary judgment on the ground, inter alia, that there was no trialworthy dispute _____ ____ concerning whether defendants had discriminated against Diaz in 7 violation of the VRRA. Diaz seasonably interposed opposition to the motion for summary judgment. Thereafter, the parties stipu- lated to certain uncontested facts and consented to proceed to final judgment before a magistrate judge in accordance with 28 U.S.C. 636(c)(1) and (3) and Fed. R. Civ. P. 73. Ultimately, the magistrate judge entered summary judgment for both defendants.  II II DISCUSSION4 DISCUSSION __________ The VRRA is to be liberally construed. Alabama Power _____________ Co. v. Davis, 431 U.S. 581, 584 (1977); Bunnell v. New England ___ _____ _______ ___________ Teamsters & Trucking Indus. Pension Fund, 655 F.2d 451, 453 (1st _________________________________________ Cir. 1981), cert. denied, 455 U.S. 908 (1982). VRRA 2021(b)(3) _____ ______ provides in pertinent part that "[a]ny person [employed by a State or political subdivision, or by a private employer,] shall not be denied . . . retention in employment, or any promotion or other incident or advantage of employment because of any obliga- _____ ________ __ _________ __ __________ tion as a member of a Reserve component of the Armed Forces." 38 U.S.C. 2021(b)(3) (emphasis added).5 Its legislative history  ____________________ 4We review the summary judgment ruling de novo. McCabe, 77 __ ____ ______ F.3d at 544.  5Although Diaz cites to VRRA 2021(b)(1), which relates to veteran's reemployment rights, the magistrate judge appropriately ____________ analyzed the claim under 2021(b)(3), which pertains to the rights of reservists. In turn, 2022 establishes a remedy against covered employers who fail to comply with 2021(b)(3):  If any employer, who is a private employer or __ ___ a State or political subdivision thereof, _____ __ _________ ___________ fails or refuses to comply with the provi- _____ __ ______ ____ sions of section . . . [2021](b)(3) . . . of _______ ____________ this title, the district court . . . shall ___ ________ _____ _____ have the power . . . to require such employer ____ ___ _____ __ _______ ____ ________ 8 likewise reflects that VRRA 2021(b)(3) "was enacted for the . . . limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated solely by _______________ ____ _________ ___ ________ ______ reserve status . . . [and] the temptation of employers to deny them the same treatment afforded their co-workers without mili- tary obligations." Monroe v. Standard Oil Co., 452 U.S. 549, ______ ________________ 559-600 (1981) (emphasis added).  A. "Discriminations Like Discharge and Demotion" A. "Discriminations Like Discharge and Demotion ___________________________________________ VRRA 2021(b)(3) is designed to deter discriminatory employment actions "like discharge and demotion," id. at 559; see __ ___ also Carlson v. New Hampshire Dep't of Safety, 609 F.2d 1024, ____ _______ ______________________________ 1027 (1st Cir. 1979), cert. denied, 446 U.S. 913 (1980), based _____ ______ solely on the plaintiff-employee's reservist responsibilities. Monroe, 452 U.S. at 559.6 Since Diaz was neither discharged, ______  ____________________ to comply with such provisions and to compen- __ ______ ___ __ _______ sate such person for any loss of wages or ____ ____ ______ ___ ___ ____ __ _____ __ benefits suffered by reason of such employ- ________ er's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits pro- vided for in such provisions. . . . No State statute of limitations shall apply to any proceedings under this chapter.  38 U.S.C. 2022 (emphasis added).  6On October 13, 1994, the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. 4301 et seq., __ ____ replaced the VRRA. Gummo v. Village of Depew, N.Y., 75 F.3d 98, _____ ______________________ 105 (2d Cir.), cert. denied, 64 U.S.L.W. 3759, 3762 (U.S. May 13, _____ ______ 1996) (No. 95-1465). Although Diaz contends on appeal that USERRA 4311 retroactively applies to his discrimination claim, he failed to raise this contention in the district court through- out the entire 8-month period following USERRA's enactment. Consequently, we deem it waived. See Credit Francais Int'l, S.A. ___ ___________________________ v. Bio-Vita, Ltd., 78 F.3d 698, 709 (1st Cir. 1996). ______________ 9 see Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 704 (1st ___ ________________ ______________ Cir. 1993), nor formally demoted, we first determine whether he was subjected to a discriminatory employment action "like demo- tion." See Monroe, 452 U.S. at 559-600. Secondly, we inquire ___ ______ whether any such discriminatory employment action was "motivated solely by [his] reserve status." Id. at 559.  __ VRRA 2021(b)(3) was enacted "to protect potential and existing reservists from policies that deter employees from joining the reserves." Boyle v. Burke, 925 F.2d 497, 502 (1st _____ _____ Cir. 1991); see also Gummo v. Village of Depew, N.Y., 75 F.3d 98, ___ ____ _____ ______________________ 104 (2d Cir.), cert. denied, 64 U.S.L.W. 3759, 3762 (U.S. May 13, _____ ______ 1996) (No. 95-1465). Although appellees contend that their employment actions denied Diaz no "incident or advantage of employment" within the meaning of VRRA 2021(b)(3), we think there can be no question that discriminatory employment actions "like demotion," including constructive demotion, based solely on reservist participation, constitute the very sort of discrimina- tory conduct the Congress sought to deter under 2021(b)(3).  We have held that a state trooper was denied an "inci- dent or advantage of employment" by reason of his reservist training and responsibilities when he was transferred from an eight-hour weekday shift to a nine-hour shift which included weekend duty. Carlson, 609 F.2d at 1027. There we noted that _______ "the [defendant-employer] would be free to transfer plaintiff at any time, including while his reserve duties were in progress, for reasons unrelated to his reserve obligations[,] but . . . not 10 . . . to [deny] him . . . a previously enjoyed incident or advantage of employment" based on his reserve obligations. Id. ___ More to the present point, Carlson made clear that the shift _______ reassignment was a constructive demotion because it required weekend work, as well as night work, and therefore constituted an employment action which might deter a trooper from participating in the military reserves. Id. The challenged reassignment, __ based solely on reservist obligations, thus violated VRRA  2021(b)(3). Accordingly, the Carlson panel ordered the trooper _______ "restored to his former work assignment." See id. (citing VRRA  ___ ___ 2022).  As an "outright demotion[] involve[s] reductions in pay and official rank," Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d ___________________ ____________ 1209, 1218 n.8 (1st Cir. 1989) (en banc), a constructive reduc- tion in pay or rank ("constructive demotion") would constitute an employment action sufficiently "like demotion" to satisfy the severity standard imposed by Monroe, 452 U.S. at 559. See Clark ______ ___ _____ v. Township of Falls, 890 F.2d 611, 618 (3d Cir. 1989) ("Actual _________________ reduction in rank is effected by a change in job title. When the . . . job title has not been altered . . , we must look to other traditional indicia of change in rank to determine whether the employee's rank constructively has been reduced."). Suggested indicia for determining whether challenged employment actions constitute a "constructive demotion" include duty assignments normally given to lower level employees, substantial reductions in work responsibilities, "termination of privileges of rank, and 11 whether the changes or restrictions are temporary." Id. For __ example, the trooper in Carlson was not formally reduced in rank, _______ but nonetheless underwent a constructive reduction in rank as a result of his assignment from an eight-hour weekday shift to a nine-hour shift which included weekend duty. See Carlson, 609 ___ _______ F.2d at 1027. Thus, reassignment to a substantially less favor- able work schedule deprived Carlson of a privilege of rank, resulting in a constructive demotion because of his reservist duties, in violation of VRRA 2021(b)(3). The summary judgment record discloses that Diaz had been subjected to adverse changes in work conditions as well, upon return from active duty with the Army Reserves. First, he lost substantial privileges of rank, in that he was assigned a work station, with no desk or chair, in a cubicle filled with boxes and office supplies. On four occasions in 1991 alone, either before or during military leaves, his desk and belongings were relocated apart from all his co-workers. In early 1992, Diaz, alone among his co-workers, was provided with no telephone whatsoever. Second, Diaz' job responsibilities had been reduced to the point that by early 1992 all his work duties had been ___ assigned to others. Thus, for five consecutive weeks during this period, Diaz was given no work duties at all. Cf. Agosto-de- __ __ __________ Feliciano, 889 F.2d at 1219 (holding that reduction in work _________ duties must extend beyond a "week or two" before it will be considered sufficiently severe to be actionable in First Amend- ment "political discrimination" context); compare Township of _______ ____________ 12 Falls, 890 F.2d at 618 (holding that a partial reduction in _____ duties during six-week period constituted temporary reassignment insufficient to support procedural due process claim under Fourteenth Amendment). Third, Diaz was "left in limbo" as to his actual rank, since he was without a job description for six years and given no work responsibilities for weeks at a time. Once work assignments resumed, moreover, Diaz was not informed as to their grade level.  Viewing the competent evidence, and all reasonable inferences therefrom, in the light most favorable to Diaz, we conclude that he generated a trialworthy issue of material fact as to whether the cumulative effect of these adverse employment actions was enough "like demotion" to be actionable under VRRA  2021(b)(3). A reasonable trier of fact could find that Diaz was subjected to adverse work-condition changes, extending over more than five years and amounting to constructive reductions in rank, that could deter continued participation in the military re- serves. Thus, Diaz made out a prima facie case that he had been denied "incident[s] or advantage[s] of employment" within the meaning of VRRA 2021(b)(3).  B. "Motivated Solely By Reserve Status" B. "Motivated Solely By Reserve Status __________________________________ The VRRA affords recourse for certain discriminatory employment actions against employee-reservists taken "solely because of their military obligations." Monroe, 452 U.S. at ______ 13 565.7 As there is scant evidence that the alleged adverse employment actions against Diaz were other than reservist-status based, we conclude that there is sufficient evidence, if credit- ed, to meet the second criterion under VRRA 2021(b)(3) as well.8  Diaz proffered considerable circumstantial evidence ______________ that the challenged actions were motivated by his reservist obligations. For example, following his return from active reserve duty in 1987, he was assigned to a cubicle filled with boxes and office supplies, with no desk or chair. Again, in 1991, upon returning from reserve duty, he underwent repeated relocations to work stations apart from all co-workers. After returning from reserve training in 1992, he was assigned no work responsibilities for five consecutive weeks. See also supra at ___ ____ _____  ____________________ 7Even though the Monroe Court (5-4) was sharply divided, the ______ Justices were as one on the central question presented here. All agreed, at a minimum, that VRRA 2021(b)(3) prohibits certain discriminatory employment actions motivated by the plaintiff- ______________ employee's reservist status. Their disagreement concerned only whether reservists are entitled to preferential work-schedule ____________ accommodations by reason of their military training responsibili- ties. Diaz, on the other hand, alleges discriminatory employment ______________ actions based on his responsibilities as a reservist. 8Upon remand, the district court must determine whether any uncontroverted material facts are to be deemed established. See ___ Fed. R. Civ. P. 56(d). We note that the exact burden allocation regimen appropriate for application to a VRRA claim at summary judgment has not been addressed by the parties or the district court. Furthermore, though Diaz now contends that USERRA 4311 applies retroactively to the present case, he made no such contention below, nor does he now contend that the USERRA pre- scribes the burden allocation regimen for these VRRA claims. Consequently, we decline to volunteer our views on these matters in the present vacuum. See Credit Francais Int'l., S.A., 78 F.3d ___ ____________________________ at 709.  14 pp. 12-13.  Diaz also proffered direct evidence of a reservist- ______ based discriminatory animus on the part of the RWA, including his deposition testimony that Regional Director Castro-Mundo, in demanding improved performance, criticized Diaz for wasting a lot of time on official matters, including military exercises. Diaz further states that Supervisor Figueroa informed him that the reason Diaz had no telephone was that he was on "one of those damn military leaves" when the telephone company representative came.  15 Viewed in context, this evidence cannot be dismissed simply as "stray remarks in the workplace . . . , statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself," Price Waterhouse v. Hopkins, 490 ________________ _______ U.S. 228, 277 (1989) (O'Connor, J., concurring), particularly since these statements are attributed to supervisors or office directors with apparent authority to affect Diaz' work conditions in a significant manner through work-station, work-condition, equipment, and job assignments, as well as performance evalua- tions. The statement attributed to Supervisor Figueroa, in particular, could support a fair inference that the discriminato- ry work conditions, viz., the total denial of a telephone and ___ work assignments, as well as repeated work-station changes, were directly linked to Diaz' reservist status and responsibilities.  Furthermore, for their part defendants offer no expla- __ nation for not providing Diaz with either a desk or a chair for an entire month following his return from military leave in 1987. As for the disparaging remarks made to Diaz by Supervisor Freses in 1988, relating to the military and to Diaz' military exercises in particular, the defendants merely point out that Diaz has acknowledged that these remarks took the outward form of "jokes." _______ ____ Thus, defendants tender no compelling basis upon which to con- clude that a factfinder could not reasonably infer a discrimina- tory reservist-based motivation from the direct and circumstan- tial evidence proffered by Diaz.  16 Similarly, defendants offer no explanation for refusing  to assign Diaz work responsibilities for a total of five weeks during a ten-week period following his return from military leave in 1992, notwithstanding the fact that the manager of the Partic- ipant Services Division, to which Diaz was assigned at the time, advised the Director of the Occupational Orientation Division, in writing, that "non-use of [Diaz] is not productive nor advisable for the best welfare of the Occupational Orientation Division." To this point, therefore, defendants have met Diaz' competent direct and circumstantial evidence with neither evidence nor explanation which would compel a reasonable trier of fact to find that the challenged employment actions were not motivated solely by Diaz' reservist obligations. Thus, summary judgment was precluded on the present record.  C. Eleventh Amendment Immunity  C. Eleventh Amendment Immunity  ___________________________ The Eleventh Amendment immunity defense to the claim for damages fails as well. As this court held in Reopell v. _______ Massachusetts, 936 F.2d 12, 16 (1st Cir.), cert. denied, 502 U.S. _____________ ____ ______ 1004 (1991), Congress, acting pursuant to its War Powers, see ___ U.S. Const. art. I, 8, "removed the Eleventh Amendment bar to damages actions brought under [the VRRA] . . . ." Since no subsequent development has undermined Reopell, we remain bound by _______ it. Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir.), ________ _________________ cert. denied, 116 S. Ct. 51 (1995).9 Accordingly, defendants _____ ______  ____________________ 9The recent decision in Seminole Tribe of Florida v. Flori- _________________________ ______ da, 116 S. Ct. 1114 (1996), which overrules Pennsylvania v. Union __ ____________ _____ Gas Co., 491 U.S. 1 (1989), and holds that Congress lacks the _______ 17 are not entitled to Eleventh Amendment immunity from suit for compensatory damages under VRRA 2021(b)(3). III III CONCLUSION CONCLUSION __________ We therefore hold that an employee-reservist may assert a claim under VRRA 2021(b)(3) based on constructive demotion, i.e., a discriminatory employment action, "like demotion," in the nature of a constructive reduction in rank and motivated solely by participation in the reserves. Furthermore, viewing the competent evidence most favorably to Diaz, a reasonable trier of fact could find that Diaz was constructively reduced in rank based solely on his reservist participation and obligations. Finally, we conclude that the Eleventh Amendment does not immu- nize defendants from suit under VRRA 2021(b)(3). Accordingly, the district court judgment is vacated and the case is remanded for further proceedings consistent with this opinion.  So ordered. Costs to appellant. So ordered. Costs to appellant. _______________________________   ____________________ power to abrogate the Eleventh Amendment under the Commerce Clause, does not control the War Powers analysis. See CEH, Inc. ___ _________ v. F/V Seafarer, 70 F.3d 694, 702 (1st Cir. 1995) ("[W]e are ____________ hesitant to ascribe to the Court a holding that goes well beyond any issue discussed there.").  18