William **MIDDLETON**, Plaintiff,

v.

**CITY OF SHERWOOD, a municipal corporation; Sherwood Police Department; Ross Schultz, Ronald Ruecker, and James Patterson, individuals, Defendants.**

**Civil No. 08–604–HA.**

United States District Court,
D. Oregon.

May 18, 2009.

Michael K. Kelley, Christopher G. Lundbe, Matthew E. Malmsheimer, Haglund Kelley Horngren Jones & Wilder, LLP, Portland, OR, for Plaintiff.

Karen M. O'Kasey, Kari A. Furnanz, Hoffman Hart & Wagner, LLP, Portland, OR, for Defendants.

## OPINION AND ORDER

HAGGERTY, District Judge:

Plaintiff alleges that defendants violated the Uniform Services Employment and Reemployment Rights Act (USERRA) when they failed to reemploy him in the same position he had held before leaving for military service. Plaintiff also claims that he faced discrimination following his return and was constructively discharged because of his military service. Defendants filed a Motion for Partial Summary Judgment [15]. Oral argument on this motion was held on May 11, 2009. For the following reasons, defendants' motion is granted in part and denied in part.

## STANDARDS

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c); *see Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991). The moving party carries the initial burden of proof and meets this burden by identifying portions of the record on file that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.*

The court must view the evidence in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.2000) (citations omitted). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *MetroPCS, Inc. v. City and County of S.F.*, 400 F.3d 715, 720 (9th Cir.2005) (citation omitted). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v.*

*Ins. Co. of N. Am.,* 638 F.2d 136, 140 (9th Cir.1981) (citing Fed.R.Civ.P. 56(c)).

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted and are stated in the light most favorable to plaintiff.

Plaintiff was hired by the City of Sherwood as Chief of Police in 1995. The city was aware that plaintiff served in the military reserves when he was hired.

Plaintiff took military leave for training and active duty assignments throughout his employment. Between 1996 and 2001, plaintiff went to nine trainings. He returned each time to his position as Chief of Police. In September of 2002, plaintiff was called to active duty for 365 days. After this year of military duty, plaintiff returned to his position.

During his decade as Police Chief, plaintiff had never been suspended, demoted, or disciplined. Plaintiff received positive feedback throughout his tenure. In his performance review for the year 2000, City Manager John Morgan indicated that plaintiff "exceeded my expectations of a Police Chief, and has exceeded my expectations of a member of the City's management team." Kelley Aff., Ex. 22 at 3. In his 2001 performance review, City Manager Ross Schultz reported that plaintiff was "well respected by his staff" and the "management team has nothing but good things to say about [plaintiff] and his ability to work as a team member." Kelley Aff., Ex. 23 at 1–2. In his 2003 performance review, Schultz commented that plaintiff made "the City look good and I wish more of the staff would take his lead" in joining civic groups. Kelley Aff., Ex. 24 at 2. Although plaintiff's annual evaluation for 2003 remained positive, Schultz noted that plaintiff's military service had caused him to miss most of the year. Schultz stated that plaintiff should try to be "at work at least 2/3rds" of the upcoming year. *Id.*

In November 2005, plaintiff received mobilization orders for another tour of duty. Although plaintiff was originally called up for a 365 day tour, this second tour of duty was extended until May 2007.

While plaintiff was on active duty, he learned that several complaints had been filed against him: the acting Chief of Police, Tim Addelman, had accused plaintiff of perjury and a member of the administrative staff, Susan Phillips, had accused plaintiff of hostile work environment and retaliation. Plaintiff alleges that, although the complaints lacked merit, City Manager Schultz "basically told me that if I were to resign from my position as Chief of Police they would make all of those allegations 'go away.'" Middleton Aff. ¶ 6. Plaintiff refused to resign.

In approximately March 2007, Schultz flew to Washington, D.C. to meet with plaintiff. Schultz indicated that Ronald Ruecker, who was working for the City of Sherwood in plaintiff's absence, needed to become Police Chief. Schultz asked plaintiff to accept a demotion to Deputy Chief, and presented him with a contract entitled "Reemployment Agreement and Limited Release." This contract stated that: "The city believes that Middleton's reemployment rights are in conflict with its need to have a qualified and experienced law enforcement professional in that position at all times providing continuity of leadership, mentorship and growing the police function within the Sherwood community." Kelley Aff., Ex. 9. Schultz told plaintiff that defendant could not afford two police chiefs, and if he did not sign the contract then Ruecker would be terminated. Plaintiff refused to sign the contract.

After plaintiff refused to take a demotion, defendants created a new job—Director of Public Safety. Ruecker was hired to fill this position. The Public

Safety Director's responsibilities included overseeing Public Safety Services. Such services encompassed: "Emergency Management, Police, and Community Safety Programs"; "Act[ing] as Chief of Police in absences"; and "Research[ing] and appl[ying] for appropriate grants available." Kelley Aff., Ex. 15 at 1.

Plaintiff alleges that he "had for over twelve years already performed virtually every function identified" in the Public Safety Director job description and that it "took away most of [his] previously held duties." Middleton Aff. ¶ 8. In addition, the creation of the Public Safety Director position altered the city's organizational chart. Whereas the Chief of Police had previously reported directly to the City Manager, the Director of Public Safety now served as the intermediary between the City Manager and the police department, effectively becoming the highest ranking police official in the city. Kelley Aff., Ex. 17, 18.

Plaintiff returned from military service and resumed his position as Chief of Police on May 14, 2007. On plaintiff's first day, he met with Ruecker and Assistant City Manager James Patterson. Patterson told plaintiff that he should not discuss any complaints that had been filed against him, including the Addelman perjury allegation and the Phillips hostile work environment claim.

Plaintiff subsequently met with the entire staff of the police department. At this meeting, officers mentioned that they had been having problems with Susan Phillips and Julie Chiamulera, another employee who had filed a complaint against plaintiff for hostile work environment and retaliation. Although plaintiff did not discuss the details of these complaints, plaintiff disclosed that both women had filed complaints against him and that he could not take any action against them.

Patterson met with plaintiff a second time. Plaintiff was reprimanded for mentioning the staff complaints during the police department meeting. Patterson told plaintiff that if he made any more missteps, he would be terminated. During this meeting, plaintiff allegedly used obscenities and told Patterson that he had "better be sleeping with both of his eyes open." Middleton Dep. 205:23–206–2. Plaintiff asserts that he and Patterson were joking and that he was not being serious when he made this comment.

On May 15, 2007, Phillips filed a second hostile work environment complaint against plaintiff. Phillips accused plaintiff of sharing confidential information about her complaint with the other members of the police department and alleged that the disclosure was in retaliation against her.

On May 16, 2007, plaintiff was placed on paid administrative leave and ordered to undergo a psychiatric evaluation. Schultz was aware that this medical evaluation could jeopardize plaintiff's security clearance with the Army. Schultz allegedly told plaintiff that if he resigned as Police Chief, the medical examination would "go away." Middleton Aff. ¶ 9. Plaintiff underwent the psychiatric evaluation and was found fit for duty.

Plaintiff then received a pre-termination notice. This notice set forth the disciplinary procedures that would take place prior to any final employment decision.

On August 21, 2007, Ruecker recommended that plaintiff be terminated. Ruecker has testified that this decision was based solely on the events of May 14, 2007. Ruecker asserted that he did not consider plaintiff's prior performance as Chief of Police, did not inspect plaintiff's personnel record, and was unaware of any previous criticisms regarding plaintiff's performance. Ruecker also testified that

he had no knowledge that plaintiff had been subjected to discipline during his twelve years as Police Chief.

Pursuant to the termination process, plaintiff met with Schultz on August 27, 2007. Plaintiff presented a response to the termination recommendation. Plaintiff also submitted a job application to Warner Pacific College on August 27, 2007.

Schultz decided to suspend plaintiff from his position without pay for two pay periods instead of terminating him. This suspension was scheduled to end on October 25, 2007.

Plaintiff accepted employment with Warner Pacific College on October 5, 2007.

In October, plaintiff returned to the department while he was on unpaid leave and turned in his equipment.

Plaintiff did not return as Police Chief on October 25, 2007, having started work at Warner Pacific College on that day.

## QUESTIONS PRESENTED

Plaintiff brings claims under § 4311 and § 4312 of USERRA. Defendants have not challenged plaintiff's § 4311 claim, but move for summary judgment of plaintiff's § 4312 claim. This court is presented with a question of first impression: can an employer violate § 4312 of USERRA when an employee returns to the same job title they held before their military service?

Defendants also argue that plaintiff's constructive discharge claim should be dismissed because plaintiff voluntarily resigned his employment.

## DISCUSSION

### 1. Plaintiff's reemployment rights under 38 U.S.C. § 4312

Under § 4312 of USERRA, service members are entitled to reemployment in the position they would have had were it not for their military service "or a position of like seniority, status, and pay." 38 U.S.C. § 4313(a)(2)(A). Defendants move for summary judgment on plaintiff's § 4312 claim, arguing that plaintiff's reemployment rights were satisfied because plaintiff returned to the "same position with the same title, rate of pay, and working location." Defs.' Mem. in Supp. at 7.

Plaintiff contends that he was constructively demoted when defendants created the Director of Public Safety position.

Prior to his military service, plaintiff reported directly to the City Manager and was the highest law enforcement officer in the city. After Ruecker was installed as Director of Public Safety, however, plaintiff was expected to report to Ruecker who was charged with directing and overseeing the police department. In addition, plaintiff argues that he had previously performed "virtually every function identified" in the Public Safety Director job description and that it "took away most of [his] previously held duties." Middleton Aff. ¶ 8.

In *Nichols v. Department of Veterans Affairs,* the plaintiff was employed as Chief of Chaplain Services by the Department of Veterans Affairs (VA). 11 F.3d 160, 161 (Fed.Cir.1993). During the plaintiff's deployment, the VA appointed a new Chief of Chaplain Services. *Id.* Upon his return, the VA offered plaintiff a position as Staff Chaplain. *Id.* While conceding that this new position was of "like seniority and pay," plaintiff challenged whether the position was of like status under the Veterans' Reemployment Rights Act of 1968 (VRRA).[1] *Id.* at 162. Concluding that the VA had not fulfilled its reemployment duties, the court observed that:

1. "In enacting USERRA, Congress emphasized USERRA's continuity with the VRRA and its intention to clarify and strengthen that law." 20 C.F.R. § 1002.2 (2006).

Nichols' former position was invested with the necessary authority to fulfill its responsibilities. In that position, he was the boss, and supervised a number of staff chaplains. Now he has no staff at all to assist with the wide range of responsibilities assigned. And he must report to and be supervised by the incumbent of the very same position he formerly held, as well as a number of other supervisors.... It goes without saying that when one starts out as the boss, but is placed in a position subordinate to the replacement boss, and other new bosses, there is incontestably a loss of authority, and accordingly a diminished status.

*Id.* at 163–64.

In another case interpreting the VRRA, *Diaz–Gandia v. Dapena–Thompson,* the Third Circuit concluded that the statute prevented employers from constructively demoting service members. 90 F.3d 609, 614 (1st Cir.1996). The plaintiff in *Diaz–Gandia* alleged the following adverse changes to his work conditions:

First, he lost substantial privileges of rank, in that he was assigned a work station, with no desk or chair, in a cubicle filled with boxes and office supplies.... Second, Diaz' job responsibilities had been reduced to the point that by early 1992 all his work duties had been assigned to others.... Third, Diaz was "left in limbo" as to his actual rank, since he was without a job description for six years and given no work responsibilities for weeks at a time.

*Id.* at 614–15. The Third Circuit concluded that these facts "generated a trialworthy issue of material fact as to whether the cumulative effect of these adverse employment actions was enough 'like demotion' to be actionable" under the VRRA. *Id.* at 615; *see also Sharp v. City of Houston,* 164 F.3d 923, 933 (5th Cir.1999) (observing that, under Title VII, "a transfer need not result in a decrease in pay, title, or grade [to constitute an adverse employment action]; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement"); *Moorehead v. Chertoff,* No. C05–1767JLR, 2007 WL 737370 at *3 (W.D.Wash. March 5, 2007) (reasoning that "a reasonable jury could conclude that the reassignment [of duties] constituted a materially adverse employment action because it took away [plaintiff's] leadership role and made her a less attractive candidate for promotion").

■ The Supreme Court has observed that reemployment rights statutes are " 'to be liberally construed for the benefit of those who left private life to service their country in its hour of great need.' " *Alabama Power Co. v. Davis,* 431 U.S. 581, 587, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977) (quoting *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 285, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946)). Applying the above cases to the context of § 4312, this court concludes that plaintiff has generated a trialworthy issue of material fact as to whether he was reemployed in the position he would have had were it not for his military service. Viewing the facts in the light most favorable to the non-moving party, defendants creation of the Public Safety Director position reduced plaintiff from being the top law enforcement officer in the city to being second in command. Not only was plaintiff placed in a position subordinate to the Public Safety Director, most of plaintiff's previously held duties were reassigned to the Public Safety Director.

Because the protections of USERRA are to be liberally construed, this court concludes that USERRA, like the VRRA, prohibits the constructive demotion of a service member. There is evidence in the

record that would allow a reasonable jury to conclude that plaintiff's loss of authority and the reassignment of his job duties constituted a constructive demotion. Accordingly, defendant's motion for summary judgment of plaintiff's § 4312 claim is denied.

### 2. Constructive discharge

■ Defendants also move for summary judgment of plaintiff's constructive discharge claim. To establish a wrongful constructive discharge under Oregon law, plaintiff must prove that: (1) the employer created or maintained specific working conditions; (2) those working conditions were so intolerable that a reasonable person in employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain or substantially certain to leave employment, and (4) that the employee did leave employment as a result of those working conditions. *McGanty v. Staudenraus,* 321 Or. 532, 901 P.2d 841, 856–57 (1995). The elements are the same under federal law, except that the employee need not show that the employer subjectively wanted him to resign. *Poland v. Chertoff,* 494 F.3d 1174, 1185 n. 7 (9th Cir.2007) ("Unlike some of our sister circuits, we do not require that, in addition to proving that working conditions were intolerable, a plaintiff must establish that his employer created the intolerable conditions with the intent to cause the employee to resign.").

In *Brooks v. San Mateo,* the Ninth Circuit observed that "constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." 229 F.3d 917, 930 (9th Cir.2000) (quotation marks omitted). "The determination whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact." *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir.1987).

Although plaintiff was placed on administrative leave and later suspended without pay, defendants contend that a disciplinary action is insufficient as a matter of law to support a constructive discharge claim. As the Ninth Circuit observed in *Poland,* federal courts "set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." 494 F.3d at 1184.

■ Generally, employees cannot be constructively discharged because of suspensions. In *Levenstein v. Salafsky,* the Seventh Circuit concluded "that a person who is on leave with pay, with a temporary (though unsatisfying) reassignment pending an investigation of serious job misconduct, who resigns rather than waits for the conclusion of reasonable prescribed due process procedures of the institution, has not from an objective standpoint been constructively discharged." 414 F.3d 767, 775 (7th Cir.2005) (holding that plaintiff was not constructively discharged despite being reassigned for nearly a year while allegations of sexual harassment were investigated); *see also White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 803 (6th Cir.2004) (holding that "a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action"); *Breaux v. City of Garland,* 205 F.3d 150,

158 (5th Cir.2000) (holding that a police officer suffered no adverse employment action where he was temporarily placed on paid administrative leave during an internal investigation). Unlike the employees in *Levenstein, White,* and *Breaux,* however, plaintiff was initially placed on paid administrative leave and later suspended *without* pay.

The Ninth Circuit has held that an employee who "was not demoted, did not receive a cut in pay, was not encouraged to resign or retire, and was not disciplined" did not set out a viable constructive discharge claim. *Schnidrig v. Columbia Machine, Inc.,* 80 F.3d 1406, 1412 (9th Cir. 1996). Although plaintiff did not receive a pay cut, he has introduced evidence that he was constructively demoted, suspended without pay, continuously encouraged to resign or accept a demotion, and subjected to discipline. This case is sufficiently distinguishable from *Schnidrig.*

The key issue is whether a reasonable person in plaintiff's position would have had no choice but to resign because of the actions taken by Ruecker, Schultz, and Patterson. "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders,* 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). Although defendant attempts to isolate the disciplinary actions taken against plaintiff, this court must consider the full history of harassment and coercion by defendants. Viewing the facts in the light most favorable to the non-moving party:

- Schultz told plaintiff that he could make the Addelman and Phillips complaints "go away" if he resigned.
- In March 2007, Schultz flew to Washington, D.C., and encouraged plaintiff to accept a demotion to Deputy Chief of Police.
- When plaintiff refused the demotion, defendants created a new position— Director of Public Safety—that caused plaintiff to be constructively demoted.
- Plaintiff only returned to work for two days before he was placed on paid administrative leave.
- Plaintiff was forced to undergo a medical examination that jeopardized his security clearance. Schultz again told plaintiff that he could make the medical examination "go away" if he resigned.
- Ruecker recommended that Schultz terminate plaintiff. Ruecker made this recommendation without reviewing plaintiff's personnel file, and did not consider plaintiff's excellent performance ratings or spotless record.
- Schultz decided against terminating plaintiff, instead suspending him without pay for two pay periods.

Between November 2005 and October 2007, plaintiff spent eighteen months on active military duty, returned to work as Chief of Police for two days, and was then placed on administrative leave for five months. Beginning in late 2006, city manager Schultz repeatedly encouraged plaintiff to resign or accept a demotion. Ruecker, who would have been Police Chief had plaintiff accepted a demotion, also opposed plaintiff's continued employment with the city. Even though plaintiff had never been disciplined during his lengthy tenure as Police Chief, Ruecker recommended that Schultz immediately terminate plaintiff rather than apply progressive discipline.

■ Given these facts, a reasonable jury could conclude that a reasonable person in plaintiff's position would have felt compelled to resign in October 2007. As discussed above, there is evidence suggesting that Schultz and Ruecker targeted plaintiff

throughout 2007. Although Schultz eventually decided not to terminate plaintiff for his alleged insubordination, a jury could conclude that a reasonable person would not have returned to work given Schultz and Ruecker's behavior. Plaintiff alleges that he was repeatedly asked to resign, constructively demoted, placed on paid administrative leave with little justification, forced to undergo a medical examination that jeopardized his security clearance, and suspended without pay for two weeks. Viewing the record as a whole, a reasonable jury could conclude that a reasonable person in plaintiff's position would have felt no choice but to seek alternate employment. This court concludes that plaintiff has introduced sufficient facts to establish a claim of constructive discharge.

### 3. Punitive Damages and the Individually Named Defendants

Plaintiff has agreed to voluntarily dismiss his claim for punitive damages against all parties, and also dismiss his constructive discharge claim against the individually named defendants.

### CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment [35] is granted in part and denied in part. Defendants' motion is granted as to plaintiff's claim for punitive damages and for constructive discharge against the individually named defendants. Plaintiff's claim for punitive damages and plaintiff's claim for constructive discharge against the individually named defendants are dismissed. Defendants' motion is denied as to plaintiff's § 4312 and constructive discharge claim against the City of Sherwood and Sherwood Police Department.

IT IS SO ORDERED.